UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| COACH, INC. and COACH SERVICES, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | NO. 3:11 CV 468 |
| | ) | |
| THE TREASURE BOX, INC., et al., | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

When Charles Caleb Colton wrote that "imitation is the sincerest form of flattery," he apparently didn't have the Lanham Act in mind. Had he been a legal scholar, perhaps his famous aphorism would have been more along the lines of "imitation is the surest path to litigation." Such is the case here, where The Treasure Box, a small boutique shop in Elkhart sold knockoff Coach handbags, keychains, and wallets. Unbeknownst to the Defendants, one of the purchasers of these goods wasn't one of its usual customers seeking a designer look with a meager budget; she was a private investigator hired by Coach to look into allegations that the shop was selling counterfeit Coach goods. Coach examined the merchandise and, apparently *un*flattered by the poor quality of the imitation items, filed this lawsuit. Coach now seeks summary judgment on the issue of liability [DE 20]. For the reasons explained below, Coach's motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Plaintiffs Coach, Inc. and its wholly-owned subsidiary, Coach Services, Inc. (who, for simplicity's sake, I will refer to collectively as "Coach") are the present incarnation of a business founded seventy years ago as a leather goods manufacturer [DE 21-1 at ¶¶ 3-4]. Coach has grown

from a family-run workshop into a three-billion-dollar-a-year concern that outfits customers all over the world in leather and "mixed material products" that include, among other things, handbags, wallets, travel cases, briefcases, and planners [DE 21-1 at ¶¶ 3, 6-7]. The company owns a number of valid trademarks which I will refer to, as the parties have done, as the "Coach Marks" [DE 21-1 at ¶¶ 4-5]. The Coach Marks are listed in a chart on pages four through eight of the amended complaint [DE 7 at 4-8] and reproduced in Coach's summary judgment papers [DE 21 at 3-7; DE 21-1 at 2-6]. Coach has spent over $100 million advertising, promoting, and marketing its goods bearing the Coach Marks, which it sells to consumers on a retail basis and sells to other retailers and international distributors on a wholesale basis [DE 21-1 at ¶¶ 8, 11].

The Defendants are husband and wife Michael and Heather Hiatt, and their now-defunct store, The Treasure Box. The Hiatts were co-owners and the only officers of The Treasure Box, which they operated in Elkhart, Indiana [DE 21-2 at 3-4; 24-2 at 3]. The Treasure Box was only open for three months in late 2011 and was formally dissolved by Michael Hiatt in the first quarter of 2012 [DE 21-2 at 3-4]. Heather and Michael were both responsible for the operation of the store [DE 21-2 at 4]. Heather handled the purchasing and display of merchandise and was always present at the store when it was open [DE 21-2 at 4]. Michael paid the bills, did bookkeeping, and came to the store to eat lunch with his wife about once a week for approximately thirty minutes [DE 21-2 at 4; DE 24-2 at 4]. According to Heather, Michael told her that he did not care what merchandise she purchased for the store, though he gave her money to make the purchases [DE 21-2 at 4-5]. Michael was not involved in placing items for display in the store, and aside from knowing that "women's products" were sold at the store, he did not know what kind of merchandise was in it [DE

24-2 at 4]. The store's revenue went into an account that was held by the Hiatts jointly [DE 21-2 at 5].

To stock The Treasure Box, Heather purchased phony Coach merchandise from the internet and from another local Indiana store [DE 21-2 at 5]. She purchased five or six purses from the internet and three keychains and a few wallets from the brick-and-mortar store [DE 21-2 at 6].[1] Heather knew that these Coach-labeled items were not authentic Coach merchandise, and she purchased the items with the intent to sell them for profit at The Treasure Box [DE 21-2 at 5-6, 9]. In fact, Heather admits that the items she sold were "knock-offs" [DE 24-3 at 2].

The phony Coach handbags at The Treasure Box were priced from $50-$55, whereas their authentic Coach counterparts run anywhere from $238 to $358 [DE 24-3 at ¶¶ 5, 7]. Heather priced the wallets at around $20, compared to an authentic retail price of $75-80 [DE 24-3 at ¶¶ 6, 8]. The keychains were sold for $12-$15, a fraction of the genuine article's $30-$35 price tag [DE 24-3 at ¶¶ 6, 8]. Heather contends that this pricing scheme was intentionally low because she did not *want* customers to think that they were purchasing authentic Coach items, and in fact wanted to alert them that the items they were looking at were in fact counterfeit [DE 24-3 at ¶¶ 16-17].

No customers asked if the merchandise was "genuine" Coach merchandise [DE 21-8 at 4], but Heather contended in an affidavit that she told a number of other individuals, who did not make any purchases, that the Coach items were not authentic when they asked her, and she never told anyone that the items were, in fact, genuine [DE 24-3 at ¶¶ 13-14]. So customers who were told that

---

[1] At her deposition, Heather testified that she purchased five or six knockoff Coach handbags to sell at the store [DE 21-2 at 6]. However, later in her deposition, she identified a photograph of the store's merchandise as having seven counterfeit Coach bags [DE 21-2 at 8]. In their interrogatory responses, the Hiatts reported that they purchased five purses, three wallets, and two keychains [DE 21-8 at 2].

3

the items were phony chose to take a pass on them, but those who chose to make a purchase were not told this important fact.

On October 25, 2011, Coach sent an investigator to The Treasure Box to see if the store was offering counterfeit Coach merchandise for sale [DE 21-1 at ¶ 12; DE 21-12 at ¶¶ 3-4 ].  Heather was working at the store when the investigator came in [DE 21-2 at 5].  The investigator observed a number of counterfeit Coach items on display, and purchased three counterfeit Coach items: a wallet, a handbag, and a keychain [DE 21-1 at ¶¶ 13-16; DE 21-2 at 8-9; DE 21-12 at ¶¶ 3-5; DE 21-13; DE 21-14; DE 21-15; DE 21-16; DE 21-17; DE 21-18].   Coach personnel inspected photographs of the purchased items and determined that they were not authentic Coach merchandise, although they bore the Coach Marks [DE 21-1 at ¶¶ 2, 17; DE 21-12 at ¶¶ 6-7; DE 21-13; DE 21-14; DE 21-15; DE 21-16; DE 21-17; DE 21-18].   Neither the Hiatts nor The Treasure Box were authorized by Coach to manufacture, sell, or offer for sale products bearing the Coach Marks [DE 21-1 at ¶ 18].

Heather sold five counterfeit Coach bags in the month of October [DE 21-2 at 8].  When the store closed in December 2011, she had two remaining counterfeit Coach bags: she gave one to her mother and kept one for herself [DE 21-2 at 6].  Heather no longer has possession of the handbag she kept for herself because it fell apart. The unsold wallets were simply thrown away after the The Treasure Box closed  [DE 21-2 at 6-7].  And as for the three keychains, Heather sold two of them and kept the third one for herself which she later threw away because, like the handbags, basically, "[t]hey were junk."  [DE 21-2 at 7].

In December 2011, Coach sued The Treasure Box for various trademark offenses [DE 1].  In January 2012, Coach amended its complaint to name both Heather and Michael Hiatt as

defendants, in addition to The Treasure Box [DE 7]. The amended complaint includes claims for trademark and trade dress infringement under the Lanham Act, 15 U.S.C. §§ 1114, 1116, 1117, 1124(a) and (c); copyright infringement under the United States Copyright Act, 17 U.S.C. § 501, *et seq.*; and Indiana state law trademark infringement, unfair competition, forgery, and counterfeiting claims [*Id.*]. Coach has now moved for partial summary judgment on the issue of liability only on its federal trademark and counterfeiting claims [DE 20].

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## I.     Trademark Infringement Claim

To prevail on a claim of trademark infringement, Coach must show that its mark is protectable and that the Defendants' use of the mark is likely to cause confusion among customers. *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001); 15 U.S.C. § 1114.

5

There is no dispute that the Coach Marks at issue here were protected: Coach has presented evidence that its Marks were federally registered, and the Defendants have presented no evidence or argument to the contrary.  Rather, they have admitted that the products that they sold were knockoffs of Coach products.  In this kind of case, where it is undisputed that the plaintiff had registered the very mark used by the defendant without the plaintiff's permission, the only issue the court need evaluate is whether the defendant's use of the mark was likely to cause confusion.  *CAE, Inc.*, 267 F.3d at 677, n.11.

In a trademark infringement case, the likelihood of consumer confusion about the origin of a company's products is ordinarily a question of fact.  *CAE, Inc.*, 267 F.3d at 677.  I say "ordinarily" because there are situations where the facts are so clearly one-sided that there is no question that confusion is likely, and in those cases the question may be resolved on summary judgment.  *See CAE, Inc.*, 267 F.3d at 677; *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008); *Door Sys. Inc. v. Pro–Line Door Sys.*, Inc., 83 F.3d 169, 173 (7th Cir.1996); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993); *Forum Corp. Of North Am. v. Forum, Ltd.*, 903 F.2d 434, 438 (7th Cir. 1990) ("We have stated a number of times that the trial court's ultimate conclusion on the likelihood of confusion is a finding of fact").

When examining whether there is a likelihood of confusion, courts look to seven factors to guide their analysis: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another.  *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008).  As with most multi-factored tests, no factor is dispositive, and

courts can assign different weights to each of the factors depending on the type of case and the facts presented, but typically, the similarity of the marks, the defendant's intent, and actual confusion are the most important considerations. *Id.*

Several courts have recognized that in counterfeit cases such as this one – where the infringer has clearly used the precise trademark's likeness on the very type of goods that the trademark holder sells – that the defendant has "intentionally copie[d] a trademark design with the intent to derive a benefit from the reputation of another" and a likelihood of confusion can be presumed. *Gen. Motors Corp. v. Autovation Technologies, Inc.,* 317 F. Supp. 2d 756, 751 (E.D. Mich. 2004), *quoting Ford Motor Co. v. Lloyd*, 22 Fed. Appx. 464, 467 (6th Cir. 2001); *see also, e.g., Ford Motor Co. v. Heritage Mgmt. Group,* Inc., 2012 WL 5931529, at *4 (E.D. Tenn. Nov. 27, 2012); *Coach, Inc. v. Richie's Playhouse Inc.*, 2013 WL 594243, at *6 (E.D. Mich. Feb. 15, 2013); *Coach, Inc. v. Island Rayz*, 2013 WL 1499610, at *5 (S.D. Ohio April 11, 2013); *Coach Inc. v. Horizon Trading USA, Inc.*, 2012 WL 5451274, at *5 (S.D.N.Y. Nov. 7, 2012), *citing Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 287 (S.D.N.Y. 2003); *Coach, Inc. v. Becka*, 2012 WL 5398830, at *3 (M.D. Ga. Nov. 2, 2012); *Coach, Inc. v. Allen*, 2012 WL 2952890, at * 8 (S.D.N.Y. July 19, 2012); *Coach, Inc. v. Chaos of Muncie*, 2012 WL 896420, at *3 (S.D. Ind., March 15, 2012). This seems entirely sensible since the only reason people sell counterfeit merchandise is to piggyback on a designer item's popularity and then profit from it in the process. *See Rolex Watch U.S.A. Inc. v. Canner*, 645 F. Supp. 484 (S.D. Fla. 1986). As the Seventh Circuit held in a non-precedential disposition, "[w]here . . . one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion."

*Microsoft Corp. v. Rechanik*, 249 Fed. Appx. 476, 479 (7th Cir. 2007), quoting *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987).

In this case, it's clear that the Defendants were looking to capitalize on the Coach name and the demand for Coach products – and the esteem that they hold in the marketplace – in selling the knockoff Coach items. Heather Hiatt admits that she purchased the knockoff items knowing that they were not authentic, with the intent to sell them for a profit at The Treasure Box, a textbook example of "capital[izing] upon the popularity of, and demand for, another's product." *Microsoft*, 249 Fed. Appx. at 479. The bottom line is that Coach merchandise carries a certain cachet in the marketplace, and Ms. Hiatt and The Treasure Box, in an attempt to exploit that demand, offered cheaper, knockoff merchandise that was intended to take advantage of Coach's status. This, therefore, is plainly a case for presuming likelihood of confusion.

But in an abundance of caution, I will take a belt-and-suspenders approach (or, perhaps more appropriate here, a clutch-purse and messenger-bag approach) and proceed with the seven factor analysis to determine whether there is a likelihood of consumer confusion. The answer is an overwhelming yes.

The first consideration in assessing consumer confusion is the similarity of the marks in question. *AutoZone, Inc.*, 543 F.3d at 929. To determine similarity, the Court views the marks as a whole, and "not from its elements separated and considered in detail." *Id.*, *quoting Estate of Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545-546, 40 S.Ct. 414, 64 L.Ed. 705 (1920). "[T]he test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source

8

of products or services with which an earlier mark is connected." *AutoZone*, 543 F.3d at 930, quoting *James Burrough Ltd. v. Sign of Beefeater, Inc*., 540 F.2d 266, 275 (7th Cir.1976).

Applying those principles here, it's clear that the marks on the phony Coach items purchased by the Coach investigator are very similar to the protected Coach Marks.  Indeed, the Defendants "do not contest the similarity of the marks" [DE 24 at 8].  Coach has presented examples of at least three of its Marks that appear on the items purchased [DE 21-5, 21-6 and 21-7], and though some of the infringing marks have slight stylistic differences from the federally registered marks, these very minute differences from the federally registered Coach Marks would not come close to alerting the public that the knockoff items were not authentic Coach products – the public would certainly associate the marks with Coach.  *See AutoZone*, 543 F.3d at 930.  So this factor plainly favors Coach.

The next question is whether the products sold are similar such that in comparing the two items "the public might very well attribute [the items] to a single source."  *AutoZone, quoting Eli Lilly & Co. v. Natural Answers, Inc*., 233 F.3d 456, 463 (7th Cir.2000), *quoting Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir.1988)).  This factor so clearly favors consumer confusion that it bears little discussion here (as opposed to a case where the defendant has used the plaintiff's mark on a product that is unrelated to the plaintiff's business or goods).  *See, e.g.*, *CAE, Inc.*, 267 F.3d at 664.  The Treasure Box sold handbags, wallets, and keychains bearing infringing marks – the very types of goods that Coach is known for. This is precisely *why* these knockoff items are in demand.  There is simply no dispute here that consumers would reasonably attribute both legitimate Coach products and the products bearing the infringing marks to the same source.

"The third factor in the likelihood of confusion analysis assesses 'whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties.'" *CAE, Inc.*, 267 F.3d at 681 (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir.1990)). The infringing products were purchased in a retail store, The Treasure Box. Coach also sells its products in retail stores, in addition to other channels. Though not specifically addressed by the parties, Coach sells its products throughout the United States, including northern Indiana, where The Treasure Box was located. So this factor likewise favors Coach.

It's worth pausing at this point and addressing the Defendants' argument that they sold very little merchandise for a very small amount of money, during the very small window of time that the store was open [DE 24 at 3]. This appears to be an oblique attempt to have me shrug my shoulders and say, what's the big deal? But there is no authority "for conditioning infringement on the scale of the parties' respective operations, and for good reason: that proposition is undoubtedly incorrect . . . infringement occurs when consumers are confused over affiliation, and not merely when businesses are identical." *AutoZone*, 543 F.3d at 932. Giving weight to such an argument would effectively "allow local businesses a free ride off of the advertising efforts and goodwill of larger national businesses." *Id.* Quite simply, ". . . trademark law makes no exception for the localized infringer." *Id.* So this makes The Treasure Box's arguments that it ran a trifling local operation neither here nor there.

The next factor involves an examination into the degree of care likely to be exercised by purchasers of both authentic Coach merchandise and the degree of care likely to be exercised by purchasers of knockoff products. *CAE, Inc.*, 267 F.3d at 682. In assessing this factor, courts abide by the general rule that the more widely accessible and inexpensive the good or service is, the more

likely it is that consumers will exercise a lesser degree of care in making the purchase.  *AutoZone*, 543 F.3d at 932-33;  *CAE, Inc.*, 267 F.3d at 683.  However, another factor in assessing this issue is whether the buyers are "sophisticated commercial buyers (as opposed to ordinary consumers)" and if purchases occur after "extensive negotiations."  *CAE, Inc.*, 267 F.3d at 683.

Coach argues that customers intentionally targeted to purchase knockoff goods like the ones offered by The Treasure Box "would be unlikely to exercise a great degree of care in this consumer transaction" [DE 21 at 20].  To that end, it cites the Defendants' interrogatory response that no customers inquired as to the provenance of the knockoff Coach goods as evidence that customers did not exercise a high degree of care [*Id.*, DE 21-8 at 4].  The Defendants' response is that these knockoffs were so tremendously bad, of such poor quality, and so clearly "junk," that no reasonably prudent consumer could possibly think that the items were the real deal.  For purposes of analysis of this factor, the Defendants argue that "it is more likely that a customer searching for a genuine Coach handbag, wallet, or key chain would exercise some sort of ordinary degree of consumer care to verify the product's authenticity" [DE 24 at 10].

This factor favors neither Coach nor The Tresure Box.  On the one hand, the prices of genuine Coach merchandise are relatively high – so it isn't hard to make the leap that a customer pondering such a purchase would exercise some degree of care before making it.  On the other hand, it does seem a stretch to say that such consumers are "sophisticated commercial buyers" who engage in any kind of negotiations before purchasing.  On balance, this factor favors neither party.

The next issue looks to the strength of the mark.  "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the

goods sold under the mark as emanating from a particular . . . source." *Eli Lilly*, 233 F.3d at 464

(quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir.1992). "The

stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone*,

543 F.3d at 933.  In this case, relevant factors in assessing the strength of the mark include length

of use of the mark; volume of sales dollars; expenditures in promoting the mark; and number of

stores or retail outlets.  *CAE, Inc.*, 267 F.3d at 685; *AutoZone*, 543 F.3d at 933.

       This issue is not in dispute, nor could it be.  Coach has established that its Marks are strong,

as evidenced by the millions of dollars that it spends annually in advertising, marketing, and

promoting its goods bearing the marks; the billions of dollars in annual revenue from sales of goods

bearing the Coach Marks; and the understanding that the purchasing public has that the Coach

Marks signify Coach goods.  The Defendants have not challenged the strength of the Coach Marks,

and so  this issue favors Coach.

       The next factor is whether there is any evidence of actual confusion. "Although evidence of

actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis

. . . this evidence is not required to prove that a likelihood of confusion exists." *CAE, Inc.*, 267 F.3d

at 685 (citing *Barbecue Marx v. 551 Ogden, Inc.*, 235 F.3d 1041, 1045 (7th Cir 2000); *Eli Lilly*, 233

F.3d at 465).  Coach essentially concedes that there is not any evidence of actual confusion in this

case, and so this factor favors the Defendants.

       The final factor in the analysis is whether the Defendants intended to palm off the products

they sold as those of another.  *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir.

2000).  In the infringement context, "'intent' refers to the intent to confuse customers, not merely

the intent to use a mark that is already in use somewhere else." *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997).

The Defendants have latched onto this language regarding "intent to confuse customers," and argue that the quality of the knockoff merchandise was so poor – remember, Heather Hiatt described it as "junk" – and the price was so low that no consumer could possibly think that the merchandise was authentic.  In other words, the Defendants claim that they didn't *want* anyone to think that the merchandise was authentic (and they priced the goods accordingly), didn't tell anyone that the merchandise was authentic, and if asked, admitted that the items were knockoffs.[2]  The Defendants are essentially arguing that they had to have been affirmatively trying to hide the ball on consumers and make them think that the merchandise was authentic Coach merchandise to be liable for trademark infringement.  Absent such an effort, according to the Defendants, there is no intent to infringe.

This argument is largely academic and perhaps illustrates why counterfeit cases might be better understood as giving rise to a presumption of consumer confusion, rather than subject to the traditional seven-factor analysis for trademark infringement.  Indeed, even in the traditional analysis,

_____

[2]This evidence comes from Heather's affidavit in opposition to summary judgment, in which she contends that she told unidentified individuals, who did not buy anything, that the purses were not authentic Coach bags [DE 24-3 at ¶ 13].  This statement is the subject of Coach's motion to strike [DE 29].  When evidence is proffered that shows that "someone" has made statements regarding confusion of products, but there are no exact statements attributed to them, the Court can disregard the evidence on hearsay and relevancy grounds.  *See Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330-31 (7th Cir. 1993) (disregarding testimony regarding lack of instances of actual confusion and testimony "generally that confusion seemed likely," specifically deposition testimony that "a gentleman" came into a booth . . . "and said something like, have you been over to Ameron's booth, you're not making that pipe [for them] are you?").  However, because I am finding in Coach's favor on this issue, I will deny the motion to strike as moot.  Additionally, I note that the information that consumers did, in fact, inquire as to the provenance of the merchandise at The Treasure Box indicates that perhaps there was some actual consumer confusion.

courts may reasonably infer an intent to confuse from the similarity of the marks where the senior mark has attained great notoriety. *AutoZone,* 543 F.3d at 934, *citing Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir.1992). For example, "[i]f the marketing and business presence of the senior mark . . . is nearly ubiquitous in the geographic area where the junior mark competes, a trier of fact can easily conclude that the creator of a strikingly similar junior mark intended to confuse." *Id.* This is precisely the situation here.

And this conclusion is entirely sensible: it simply cannot be the case that an admitted purveyor of knockoff goods who intended to profit from their sale  can claim that it did not intend to infringe merely because the goods it offered were of such terrible quality that no one could possibly think they were the real thing. Rather, an intent to "exploit consumers' associations with" the genuine article, or to profit from the goodwill associated with holder of the trademark, is sufficient. *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 830 (7th Cir. 2002).

It's absolutely clear here that the Defendants were trying to profit from consumers' goodwill towards Coach: they intended to sell phony Coach purses, and even if they wanted consumers to think that they were "fake" Coach purses, the intent was still to have consumers make an association with the Coach brand and for The Treasure Box to benefit from it. Based on the similarity between the Coach Marks and the infringing marks on the items sold by The Treasure Box, it is obvious that the Defendants intended to piggyback on Coach's status as a luxury goods maker. Heather Hiatt admitted in her deposition that she knew the goods she sought out and purchased were not authentic, but she sold them at her store regardless, with the hope of profiting from the sale of the items. Her intent was plain: she affirmatively sought out counterfeit Coach merchandise to sell in her store, for a profit. That she was selling what she considered to be obvious fakes – and even if she told others

14

that they were fakes – is of no moment, because she was intentionally benefitting from Coach's reputation.

Moreover, the Defendants' argument that they did not present the merchandise as authentic ignores what happens when the knockoff merchandise travels outside The Treasure Box's door. The Lanham Act's protections extend to post-sale confusion of potential customers. *CAE, Inc.*, 267 F.3d at 683. "Post-sale confusion can occur when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product." *Hermes Int'l. v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104, 108 (2d Cir. 2000). An example of post-sale confusion in this context would be a situation where a potential customer sees a handbag bearing an infringing Coach mark, and consistent with the customer's familiarity with Coach, mistakenly assumes that the bag is, in fact, a Coach bag, influencing her (or his) buying decision one way or another. *CAE, Inc.*, 267 F.3d at 683. That association is infringement of the mark. *Id.* Though there may not have been point-of-sale confusion in this case, others who were not present at The Treasure Box cash register when the phony items were purchased may later observe the item, assume that it is actually an authentic piece of Coach merchandise, see that it's junk, and be put off from buying a genuine Coach item. *Rolex Watch*, 645 F. Supp. at 495. The low price of Coach knockoffs increases the number in the marketplace, and so others might be "discouraged from acquiring a genuine [article] because the items have become too common place and no longer possess the prestige once associated with them." *Id.*; *see also Hermes Int'l.,* 219 F.3d at 108 (". . . the purchaser of an original is harmed by the widespread existence of knockoffs because the high

15

value of originals . . . is lessened").  For these reasons, "legislators . . . did not intend a cheap price to excuse the offense of infringement."  *Rolex Watch*, 645 F. Supp. at 495.

In the end, the Defendants' arguments that the poor quality, low prices, and lack of claims of authenticity are proof of lack of intent to confuse the public are unavailing.  Perhaps they did not intend for anyone to think that he or she was purchasing an authentic Coach bag, but they did intend to benefit from Coach's reputation in the marketplace.  This factor favors Coach.

When balancing each of these factors, it is clear that the sale of these knockoff Coach purses is likely to cause confusion among consumers.  Coach's motion for summary judgment on liability on Count II of its amended complaint, trademark infringement, is **GRANTED**.

## II.     The Counterfeiting Claim

To establish counterfeiting under the Lanham Act – and thus allowing the plaintiff to collect enhanced damages and attorneys' fees – a plaintiff must establish four elements beyond mere infringement.  *Century 21 Real Estate, LLC v. Destiny Real Estate Props.,* 2011 WL 6736060, at *3 (N.D. Ind. Dec. 19, 2011); *Coach Inc. v. Chaos of Muncie*, 2012 WL 896420, at *3 (S.D. Ind. March 15, 2012); *see also* 15 U.S.C. § 1117(b).

First, the mark must be "counterfeit," meaning "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; 15 U.S.C. § 1116(d)(1)(B)(i). Second, the mark must be registered on the U.S. Patent and Trademark Office's principal register for use on the same goods or services for which the defendant used the mark.  15 U.S.C. § 1116(d)(1)(B).  Third, the defendant must not have been authorized to use the mark at the time the goods or services were manufactured or produced. 15 U.S.C. § 1116(d)(1)(B).  Finally, the defendant must have acted with knowledge and intent. 15 U.S.C. § 1117(b).

16

In this case, for the same reasons discussed at length above regarding Coach's trademark infringement claims, Coach is entitled to summary judgment as to liability for its counterfeit claim. First, Coach has established that the infringing marks were substantially indistinguishable from the registered Coach Marks.  Second, Coach has provided evidence that the Coach Marks were properly registered trademarks.  Third, Coach has established that neither the Hiatts nor The Treasure Box were authorized to use its marks.  And finally, The Treasure Box and Heather Hiatt acted with knowledge and intent: Heather admitted that she sought out the counterfeit merchandise for The Treasure Box; purchased it; shipped it to her home; displayed it in her store; offered it for sale; sold the offending goods to Coach's investigator (and others); and did all of that with the intent of selling the counterfeit goods for a profit.  Her offering of the goods at a price below market value for authentic Coach merchandise does not negate these facts.  Accordingly, Coach is entitled to summary judgment on Count I of its amended complaint, trademark counterfeiting, and its motion is **GRANTED**.

### III.   Individual liability for Heather and Michael Hiatt

The foregoing analysis leaves the question of who exactly is liable to Coach for the trademark infringement and counterfeiting.  The Treasure Box, the offending corporate entity, clearly is liable, but typically, individual corporate officers are not liable for the infringement of their corporation absent a "special showing" that the "officer personally participates in the manufacture or sale of the infringing article;" that he " uses the corporation as an instrument to carry out his own willful and deliberate infringements," or that "he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability." *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926).  Though *Dangler* is nearly a century old, it remains good law. *See*

*Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F. Supp. 2d 1015 (N.D. Ind. 2012) (collecting recent cases citing *Dangler* and noting that *Dangler* remains good law in the Seventh Circuit for trademark infringement claims); *Do It Best Corp. v. Passport Software, Inc.*, 2004 WL 1660814, at *11-12 (N.D. Ill. July 23, 2004) (". . . despite its vintage, *Dangler* remains the law of this Circuit").

As noted above, Heather Hiatt was the person responsible for the day-to-day running of The Treasure Box. She knowingly procured the counterfeit merchandise, and is the person who sold the counterfeit merchandise in the transaction that makes up the nexus of this lawsuit.  By personally participating in the sale of the "infringing article," her liability is clear under *Dangler*.  The Defendants admit as much in their summary judgment papers, noting that Heather was the "moving, active conscious force in The Treasure Box's purchase of the 'knock-off' handbags, wallets, and key chains" [DE 24 at 12].  Accordingly, Heather Hiatt is liable in her individual capacity, and Coach's motion for summary judgment as to liability on Counts I and II of the amended complaint is **GRANTED** as to Defendant Heather Hiatt.

Michael Hiatt's involvement at The Treasure Box, by contrast, appears more tenuous.  He limited his activities to bookkeeping, bill-paying, and having an occasional in-store lunch date with his wife.  When asked if he knew what kind of merchandise was in the store, his answer was more or less the equivalent of "women stuff."  Though he admits that he spent about half an hour inside the store each week while he ate lunch with his wife, and that he recognized the store displays, on this record, there is simply no indication that Michael Hiatt had any idea that the store was selling counterfeit merchandise, and no evidence that he exceeded the scope of his corporate duties, participated in the sale or manufacture of the knockoff goods, or used The Treasure Box as an instrument to carry out his own infringing activities.

It is true that Michael Hiatt testified that he was aware that The Treasure Box did not have authority from Coach to sell Coach-labeled items. But this testimony, standing alone, is still not sufficient to find that Michael Hiatt is individually liable for The Treasure Box's infringing activities. Accordingly, the motion for summary judgment on liability for Counts I and II of the amended complaint is **DENIED** as to Defendant Michael Hiatt.

## CONCLUSION

For the foregoing reasons, the Motion for Partial Summary Judgment on the Issue of Liability of Plaintiffs Coach, Inc. and Coach Services, Inc., is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Counts I and II of the amended complaint against Defendants Heather Hiatt and The Treasure Box [DE 20]. The motion is **DENIED** as to Defendant Michael Hiatt. For the reasons expressed in this Opinion, Plaintiffs' Motion to Strike [DE 29] is **DENIED AS MOOT**.

**SO ORDERED**.

ENTERED: May 31, 2013

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT